UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **DEANNA M. GOODWIN,** | § | |
| **Plaintiff** | § | |
| **V.** | § | **CIVIL ACTION NO. C-06-283** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION

Deanna M. Goodwin filed a complaint seeking reversal of the decision of the defendant Commissioner of Social Security ("Commissioner") for the purpose of receiving Disability Insurance Benefits ("DIB"). Plaintiff filed a brief in support of her original complaint on February 13, 2007 and defendant filed her responsive brief on March 2, 2007 (D.E. 14).

## BACKGROUND

Plaintiff filed her application on June 11, 2003 and it was denied at all administrative levels (Tr. 53-56, 26-29, 31-34, 11-19, 4-6). Plaintiff alleges an inability to work since June 12, 2002 because of back pain, chronic obstructive pulmonary disease ("COPD") and a major depressive disorder (Tr. 24-25, 61). Her symptoms include low back pain, fatigue and depression (Tr. 77, 81). Plaintiff was 48 years old at the time of the hearing (Tr. 310). Prior to becoming disabled she worked as a customer service supervisor for an airline (Tr. 69).

## MEDICAL EVIDENCE

On March 15, 2002 an X-ray of plaintiff's chest showed some evidence of COPD (Tr. 118).  Plaintiff also was complaining of severe anxiety at that time (Tr. 228).

Plaintiff visited Michael A. Mauger, a chiropractor, on May 8, 2002, complaining of headaches and lower back pain.  He assessed her with a lumbosacral sprain/strain with lumbar facet joint irritation (Tr. 214).  On July 31, 2002 plaintiff had a positive Yeoman's test, positive supine leg raising on the left and right and positive sustained double leg raising (Tr. 188).  She continued to see Dr. Mauger until August 22, 2002.  Dr. Mauger commented that plaintiff had medically documented pain and a lumbar disc injury that continued to aggravate her and he suggested she participate in a chronic pain management program (Tr. 182).  During the time she was seeing Dr. Mauger plaintiff generally rated her pain from mild to discomforting with the exception of a few times when she rated it as distressing (Tr. 122-181, 156, 134, 124).

In June 2002 an MRI revealed a narrow disc space and early disc degeneration at L-4/L-5.  There was also a posterior central radial annular tear without associated disc protrusion or extrusion.  In addition, at the L-5/S-1 level there was early disc degeneration and a posterior central radial annular tear with a posterior focal central disc protrusion, without extrusion, that measured at least 3.0 mm. in diameter and abutted against both exiting right and left nerve roots of S-1, the left more than the right.  There was no downward displacement of the nerve root (Tr. 110).  In October 2003 a lumbar spine X-ray showed a small amount of degenerative changes and moderate disc space narrowing

2

at L4 and L5 and mild disc space narrowing at L3-L4.  A chest X-ray showed emphysematous changes without acute findings (Tr. 240-241).

Plaintiff underwent a psychiatric evaluation on November 5, 2003.  She reported having a long history of mental illness with her first psychiatric contact at the age of 18. She had been in psychotherapy during stressful times in her life and was taking Paxil for depression at the time of the examination.  She also reported being in constant pain and feeling frustrated (Tr. 242).

Plaintiff reported being able to maintain her personal hygiene but not being able to do household chores.  The psychiatrist found that her concentration was mildly impaired, her psychomotor activity was normal, her mood was depressed and her affect restricted (Tr. 244).  Both her short and long term memory were intact and she was able to interpret proverbs correctly.  Her insight and judgment were both fair and she appeared to be of average intelligence.  She was diagnosed with a major depressive disorder, severe without psychotic features and given a GAF of 45.[1]  The psychiatrist thought she might benefit from a trial of a different antidepressant as well as psychotherapy (Tr. 245-246).

During 2004 plaintiff was seen and treated by Michael McDaniels, D.O., for high cholesterol, allergies and COPD and also was receiving hormone replacement therapy

---

[1]The Global Assessment of Functioning ("GAF") scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  A GAF of 45 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed., p. 34.

(Tr. 279-288).  In November 2004 Dr. McDaniels completed a physical capacities evaluation for plaintiff on which he indicated that she could sit for three hours or more and stand for two hours in an eight-hour workday and would need to alternate sitting and standing throughout the day.  She could use both hands for simple grasping and fine manipulation and repetitive motion tasks, but not for pushing and pulling.  She could also use both feet for repetitive movements such as operating foot controls (Tr. 292).  Dr. McDaniels thought plaintiff could occasionally lift and carry up to 10 pounds and found she should never climb, stoop, kneel, crouch or crawl.  She could frequently balance and occasionally reach above shoulder level.  He thought plaintiff was totally restricted from working at heights, severely restricted from working around dust, fumes and gases, moderately restricted from being around moving machinery and being exposed to marked changes in temperature and humidity and mildly restricted in her ability to drive automotive equipment.  He described the level of pain she suffers as "moderate," constituting a significant handicap in regard to sustained attention and concentration that eliminated her ability to do skilled work tasks (Tr. 293).  In addition he found that plaintiff suffers from fatigue caused as a result of her chronic pain and the medications she was taking (Tr. 294).

A series of X-rays taken in December 2005 showed evidence of pelvic tilt with the left iliac crest 1.5 cm. higher than the right (Tr. 305), mild scoliosis with convexity to the right which could be secondary to leg length discrepancy and a narrow disc space at L-

4/L-5 with findings suspicious of canal stenosis at that level.  There also were

degenerative facet arthropathy changes at L-4/L-5 and L-5/S-1 bilaterally (Tr. 304).

An MRI confirmed the degenerative articular facet arthopathy changes of L-4/L-5

and L-5/S-1 bilaterally and also showed that the width of the spinal canal was normal.  At

L-4/L-5 there was a degenerative disc and a small posterior central radial annular tear

with a 2.0 mm posterior focal central disc protrusion without extrusion and without

evidence of involvement of the respective exiting right or left nerve roots of L-5.  At L-

5/S-1 there was also a small posterior central radial annular tear and small 2.0 mm

posterior central right paracentral spondylotic disc protrusion with minimal impression

upon the respective thecal sac but there was no involvement of the exiting right or left

nerve roots of S-1 (Tr. 303).  A CT scanogram of plaintiff's legs showed that her right leg

was 83.5 cm. long and her left leg was 86.1 cm. long which indicates that the left leg is at

least 8-9 mm. longer than the right one with the normal difference being up to 5.0 mm

(Tr. 302).

**HEARING TESTIMONY**

At the hearing held on October 19, 2005 plaintiff appeared with a non-attorney

representative and testified that she lived in Corpus Christi, Texas and was 48 years old,

having been born on September 3, 1957 (Tr. 308, 310).  She had graduated from high

school and had worked for Southwest Airlines from 1979 until June 2002.  She was the

supervisor for customer service at the counter and had to repeatedly lift baggage (Tr. 310-

311).  She developed severe back pain in the summer of 2002 and after attending therapy

sessions her doctor told her she could no longer do that kind of work.  Her back, hip, knee, shoulder and neck all hurt.  In addition, she has a limp (Tr. 311).

She has not had surgery and it has been recommended to her that she not have surgery.  She believes that the hip and knee pain is related to her pelvic tilt and the difference in the length of her legs.  She believes her neck and shoulder pain is a result of the fact that she is always tense because of her back pain (Tr. 312).  She was taking Naprosen, Zanaflex and Ambien.  She has trouble sleeping because she is uncomfortable and restless.  Her back pain is described as dull with sharp pains that come and go.  The medication she takes helps the pain somewhat (Tr. 313).

She also takes medication for depression, but did not know whether it was helping or not.  Her primary care giver prescribed her anti-depressant medication but she was not otherwise receiving treatment for depression (Tr. 313-314).

Her husband does the vacuuming because she cannot push and pull the vacuum cleaner.  She can wash a few dishes and fix a simple meal.  She picks up her seven-year-old granddaughter from school although it is uncomfortable for her to get in and out of the car.  She shops for groceries, but her husband brings them into the house from the car (Tr. 314).

She can sit for a while in a reclining position, but in a normal chair she has to shift around every couple of minutes.  When she stands she rocks back and forth because it feels more comfortable than standing still.  She limps and the farthest she could walk

would be a quarter of a mile.  When she exerts herself she feels like she has to recline to obtain relief (Tr. 315).

   She spends approximately one third of every day in her recliner.  She has poor energy during the day.  She cannot work because she is not able to sit or stand for very long and because she cannot concentrate.  Regarding future medical care she thinks that she will continue to do the exercises prescribed to her and have chiropractic adjustments as needed (Tr. 316).

   The administrative law judge ("ALJ") described to the vocational expert ("VE") a hypothetical person who was 48 years old with an alleged disability onset date of 46, who had a high school education and who had the same work history as plaintiff.  The person could lift a maximum of 10 pounds occasionally and frequently and could occasionally climb, stoop, kneel, crouch and balance.  She could not climb ladders, ropes or scaffolds and could not work at unprotected heights.  She would be limited in her ability to drive an automobile.  She could not be exposed to excessive fumes, dust, odors or gas in the work site.  She could stand for two hours and sit for six hours in an eight-hour work day but would need to have a sit/stand option.  She would need to do work that was routine or repetitive rather than highly detailed or highly complex (Tr. 318-319).

   The VE testified that such a person could not do plaintiff's past relevant work (Tr. 319).  Some examples of sedentary work the plaintiff could do include the job of a telephone quotation clerk, with 1,600 jobs in Texas and 88,000 in the national economy; a surveillance system monitor, with 3,000 positions in Texas and 154,000 in the national

economy; a call operator, with 3,000 jobs in Texas and 105,000 in the national economy and a charge account clerk, with 1,500 in Texas and 87,000 in the national economy (Tr. 320-321).  All of the jobs described are sedentary and unskilled (Tr. 319-321).

If a person missed more than one or two days a month because of doctors appointments or because she did not feel well she probably would be terminated.  Also, if a person took excessive breaks she probably would be terminated (Tr. 321-323).

## LEGAL STANDARDS

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).  The burden has been described as more than a scintilla, but lower than a preponderance.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" Johnson v. Bowen, 864 F.2d 340, 344 (5th Cir. 1988)(citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner.

Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994)(citations omitted).  It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors:  (1) objective medical evidence or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history.  Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work.  Martinez v. Chater, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

## DISCUSSION

The ALJ found that plaintiff had earned $24,324.40 after her alleged onset date which would constitute substantial gainful activity but he did not pursue the issue (Tr. 15).  The ALJ went on to find that plaintiff's back pain and depression are "severe" but that neither impairment  met or equaled the criteria of a listed impairment.  The ALJ found that plaintiff had the residual functional capacity ("RFC") to perform sedentary

work and found that she could not perform her past relevant work.  Based on the

testimony of the VE, the ALJ next determined that there was other work in the national

economy that plaintiff could perform, such as working as a telephone quotation clerk,

surveillance system monitor, call operator and charge account clerk.  Accordingly, the

ALJ found that she was not disabled (Tr. 14-19).

Plaintiff asserts that the Commissioner's determination that she is not disabled is

not supported by the evidence.  Specifically, plaintiff argues that (1) the ALJ failed to

assess her mental residual functional capacity at Step 4 of the sequential evaluation; (2)

the mental functional capacity finding included in the ALJ's hypothetical question to the

VE is unsupported by the substantial expert medical opinion evidence and (3) the

testimony of the VE is unreliable because it conflicts with the Dictionary of Occupational

Titles ("DOT").

## 1.   Assessment of Mental Residual Functional Capacity ("RFC")

Plaintiff asserts that after the ALJ found at Step 2 of the sequential evaluation that

her depressive disorder is "severe" that he should have assessed her mental RFC at Step 4

but failed to do so.  The technique for assessing a claimant's mental RFC is set forth at 20

C.F.R. 404.1520a.  After finding that a mental impairment is "severe," but does not meet

or equal the severity of a listed mental disorder, the ALJ must assess the plaintiff's mental

residual functional capacity using a technique described paragraphs in (b) through (e) of

the section.  20 C.F.R. § 404.1520a(d)(3).

The ALJ must then include in the written decision the pertinent findings and conclusions based on the technique.  The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of the section.  20 C.F.R. § 404.1520a(e)(2). The functional areas are (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).

In this case, the ALJ found that plaintiff's depression is a severe mental impairment, but that it did not meet or equal a listed impairment.  He then found that plaintiff could not return to her past relevant work because of the lifting requirements (Tr. 15).  At that point, the burden shifted to the Commissioner to show that jobs existed for plaintiff and the ALJ had to do the RFC assessment in order to see what type of work plaintiff might be capable of doing.

Regarding the mental RFC, the ALJ reviewed the findings of the consultative psychiatrist (Tr. 15) but found that the GAF of 45 assigned by the psychiatrist did not accurately reflect plaintiff's functioning capacity because she was not receiving psychiatric treatment, had no psychiatric hospitalizations, and there was no evidence of delusions, hallucinations, suicidal or homicidal ideations or mood swings (Tr. 16).  The ALJ then made the following assessment:

11

It is the finding of the undersigned [that] the claimant has mild restrictions of activities of daily living; mild difficulties in maintaining social functioning and has mild to at times moderate deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. She has never had episodes of deterioration or decompensation each of extended duration.

(Tr. 16).

Plaintiff complains that the ALJ did not do the analysis called for in SSR 85-16, 1985 WL 56855 (S.S.A.) and SSR 96-8P, 1996 WL 374184 (S.S.A.)[2] because the mental RFC assessment at steps 4 and 5 requires a detailed assessment of the various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in § 12.00 of the listings of impairments. But the record shows that is exactly what the ALJ did. At step 4 of the evaluation process he used the categories of activities of daily living, social functioning, concentration, persistence or pace and decompensation described in § 12.00 of the listings to describe plaintiff's functional limitations.

In addition, plaintiff complains that the ALJ did not express the RFC in terms of work-related mental functions. SSR 96-8P states that non-exertional impairments must be expressed in terms of work-related functions and when discussing a mental impairment, such functions include the abilities to understand, carry out, and remember instructions, use judgment in making work-related decisions; respond appropriately to

_____

[2]The Social Security Rulings are not binding on the court, but may be consulted when the statute at issue provides little guidance. The Fifth Circuit frequently relies on the rulings when evaluating ALJ decisions. Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)(citations omitted).

supervision, co-workers and work situations and deal with changes in a routine work setting.  Id. at *6.  The ALJ expressed the plaintiff's need for a job with reduced work-related mental functions when he described the hypothetical person to the VE as someone who would need to do work of a routine, repetitive nature, rather than highly detailed or complex work (Tr. 17, 319).  Such a description reflects a person's reduced ability to follow instructions, use her own judgment and deal with changes in a work setting.

It appears from the record that the ALJ did the mental RFC assessment called for in the regulations.  Accordingly, defendant is entitled to summary judgment on this issue.

## 2.  Findings of Mental RFC by ALJ

Plaintiff argues that to the extent the ALJ's hypothetical question to the VE can been deemed to incorporate a mental RFC finding, it is not supported by the evidence of record.  Plaintiff points out that the State Agency Medical Consultants found that plaintiff was moderately limited in her abilities (1) to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods; (3) get along with co-workers or peers without distracting them or exhibiting behavioral extremes (Tr. 263-265).  Plaintiff claims that the ALJ did not give the opinion of the state consultants the weight he was supposed to under the relevant statutes and social security rulings.

However, even if the ALJ had relied exclusively on the opinions (which he is not required to do),[3] the conclusion reached by the consultants was that plaintiff retained the ability to do work-related activities and her claim that she is disabled by her mental impairments was not fully supported by the evidence of record (Tr. 265).  In addition, the psychiatrist who examined plaintiff found that her concentration, persistence and pace were only mildly impaired, her memory was intact and her insight and judgment were fair (Tr. 244-246).  The psychiatrist's assessment of plaintiff supports the ALJ's determination that she has the mental RFC to do routine, repetitive tasks in an unskilled job.  Plaintiff's argument to the contrary is without merit.

## 3.  VE Testimony and the DOT

The DOT is published by the United States Department of Labor and contains a comprehensive listing of job titles in the United States, along with detailed requirements for each job, including its exertional level and the reasoning ability necessary to perform the work.  In Social Security proceedings the DOT is one source of reliable job information used by the Commissioner to determine whether jobs exist in the national economy for claimants seeking disability benefits.  20 C.F.R. § 404.1566(d)(1).  If there is an issue in a case regarding whether a claimant's work skills can be used in other work

---

[3]Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists.  However, State agency medical and psychological consultants are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether [a claimant] is disabled.  20 C.F.R. § 404.1527(f)(2)(i).

14

and the specific occupations in which they can be used, or if there is another similarly complex issue, a VE or other employment specialist  may be asked to testify on the issues.  20 C.F.R. § 404.1566(e).

The Fifth Circuit has stated that if there is a conflict between the vocational expert's testimony and the DOT, the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so.  Carey v. Apfel, 230 F.3d 131, 146 (5th Cir. 2000).   The Social Security Administration issued a ruling in 2000 that states that neither the DOT nor VE testimony automatically "trumps" the other if there is a conflict between the two.  Rather, the ALJ has an affirmative duty to ask about any conflict between VE testimony and information provided in the DOT.  SSR 00-4P, 2000 WL 1898704 (S.S.A.).

Plaintiff claims that there is a conflict between the VE's description of the jobs she testified plaintiff could do and the description of the same jobs in the DOT.  When the ALJ asked the plaintiff to describe jobs that were of "a routine, repetitive nature, not highly detailed, nor highly complex," she listed the jobs of a telephone quotation clerk, a surveillance system monitor, a call operator and a charge account clerk (Tr. 320-321).  According to the DOT, all four of the jobs require "Level 3" reasoning skills, which implies the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations."  Dictionary of Occupational Titles, 4th Ed., Vol. II, App. C, Components of the Definition Trailer.

15

Plaintiff argues that under the DOT the jobs described are not of a routine, repetitive nature because of the reasoning skills required and she asserts that the conflict between the DOT and the VE's testimony warrants a remand for clarification.  Defendant responds that there is no conflict between the DOT and the VE testimony because the ALJ described a person who could do work of a routine, repetitive nature that is not highly detailed or complex and that plaintiff has not shown that the DOT classification of the jobs leads to a conclusion that the jobs could not be performed by the hypothetical person described by the ALJ.

Plaintiff cites <u>Hackett v. Barnhart</u>, 395 F.3d 1168 (10th Cir. 2005) in support of her claim.  There, the ALJ found that the claimant could do "simple and routine" work tasks and then relied on the VE's testimony that the claimant could do the work of a call-out operator and surveillance system monitor, both of which require Level 3 reasoning skills. <u>Id.</u>, 395 F.3d at 1176.  The court remanded the case, finding that there was a conflict between plaintiff's inability to perform no more than simple and repetitive tasks and the Level 3 reasoning skills required in the jobs described by the VE.  <u>Id.</u>  Plaintiff cited other non-published cases in support of her argument, but did not cite to any Fifth Circuit Court of Appeals decisions.  No Fifth Circuit decisions were found addressing the issue.

It is respectfully recommended that plaintiff's case not be remanded pursuant to the holding in <u>Hackett</u> for several reasons.  First, it is unclear here that there is conflict between the DOT and the VE's testimony.  The reasoning levels range from the simplest, Level 1, which requires an employee to apply commonsense understanding to carry out

16

simple one- or two-step instructions and deal with standardized situations with occasional

or no variables in or from the instructions, to Level 6, which requires an employee,

among other things, to apply principles of logical or scientific thinking to a wide range of

intellectual and practical problems and to deal with non-verbal symbolism in its most

difficult phases.  <u>Dictionary of Occupational Titles</u>, 4th Ed., Vol. II, App. C, Components

of the Definition Trailer.  Level 3 reasoning, described above, is in the bottom half of the

reasoning requirements.

     The <u>Hackett</u> court did not give any reason for finding a conflict between the

claimant's limitation to simple and routine work tasks and the VE's testimony that she

could do jobs requiring Level 3 reasoning, other than that the limitation seemed

inconsistent with the demands of Level 3 reasoning and that Level 2 reasoning seemed

more consistent with the limitations.  <u>Hackett</u>, 395 F.3d at 1176.  Without a more specific

basis for its decision, it appears that, rather than pointing out a true conflict, the court was

substituting its judgment for that of the ALJ in the case, which it is not supposed to do.

<u>Greenspan</u>, 38 F.3d at 236.

     Second, even if there is a conflict between the DOT and the VE testimony, the

Fifth Circuit in <u>Carey</u> commented that the DOT is not comprehensive, in that it cannot

and does not purport to include each and every specific skill or qualification for a

particular job.  <u>Carey</u>, 230 F.3d at 145.  "'The value of a vocational expert is that he [or

she] is familiar with the specific requirements of a particular occupation, including

working conditions and the attributes and skills needed.'"  <u>Id.</u> (citing <u>Fields v. Bowen</u>, 805

F.2d 1168, 1170-71).  "[T]he DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job."  Id. The VE in this case reviewed the record and heard plaintiff's testimony before testifying about whether she could work with the limitations placed on her by the ALJ.  The plaintiff cannot show that the DOT description of the job is entitled to as much  credence or deference as the VE testimony about the job, or in turn, that the ALJ's reliance on the VE's testimony is contrary to the evidence in the record.

Third, the DOT lists *maximum* requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in a particular setting.  SSR 00-4P at *3.  The Social Security Administration recognizes that a VE may be able to provide more information about jobs or occupations than the DOT.  Id. Accordingly, even if plaintiff could not perform all of the Level 3 functions, the VE's uncontradicted testimony is that there is a significant number of the jobs that plaintiff can perform.

Fourth, the ALJ's determination that plaintiff could do the jobs listed is consistent with the record as a whole.  At the consultative psychiatric examination plaintiff stated that she had a history of mental illness and that she had her first psychiatric contact when she was 18 years old.  Despite her mental problems, plaintiff had a long career in customer service with Southwest Airlines.  Also, at the time of the hearing, plaintiff was caring for her 7-year-old granddaughter, including picking her up from school each day

18

(Tr. 310, 314).  In addition, she did the grocery shopping for her family (Tr. 314). Plaintiff's ability to work in her previous job despite her depression and her current ability to care for her granddaughter and tend to some of the household's need are consistent with a finding that she is capable of Level 3 reasoning  (applying commonsense understanding when carrying out instructions furnished in written, oral or diagrammatic form and having the ability to deal with problems involving several variables in or from standardized situations).

Finally, the Carey court stated that all kinds of implicit conflicts between the DOT and VE testimony are possible and that claimants should not be allowed to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the  provisions of the DOT and then present the conflict as reversible error when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.  Carey, 230 F.3d at 146-147.  Plaintiff's representative at the hearing had an opportunity to cross-examine the VE and declined to do so (Tr. 323).  She is now attempting to do what Carey sought to prohibit--she has scanned the record and found a possible conflict which might warrant a remand.[4]

---

[4]This is not to say that a clear conflict discovered after the hearing would not warrant a remand.  Carey described two possible types of conflicts: (1) if the VE testifies that a particular job required a particular exertional or skill level when the DOT expressly provides that the job requires a different exertional level and (2) if the VE's testimony places the ALJ's finding with respect to the claimant's residual functional capacity or the claimant's specific impairments in conflict with the exertional or skill level or the specific skills required for the identified jobs in the DOT.  Carey, 230 F.3d at n. 2.  While plaintiff may argue that she is pointing out the second type of conflict, the reasoning skills are set on a continuum and it is not apparent from the record that the ALJ found her incapable of performing the Level 3 reasoning requirements.

The record in this case supports the ALJ's determination that plaintiff is not disabled.  Accordingly, summary judgment should be entered for defendant and the Commissioner's decision that plaintiff is not disabled should be affirmed.

## RECOMMENDATION

For the reasons stated above, it is respectfully recommended that the Commissioner's determination that plaintiff is not disabled be affirmed.

Respectfully submitted this 22nd day of May, 2007.

_____

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1)(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).